**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| _____ )<br>PUBLIC RESOURCE.ORG )<br> )<br>     Plaintiff )<br> )<br>     v. )<br> )<br>INTERNAL REVENUE SERVICE, )<br> )<br>     Defendant. )<br>_____ ) | Case No:  3:13-cv-2789 |

**SECOND DECLARATION OF LISA ROSENMERKEL**

I, Lisa Rosenmerkel, pursuant to the provisions of 28 U.S.C. § 1746, declare as follows:

1. I have previously submitted a declaration in this action, which is incorporated herein by reference.

2. As described in my prior declaration, I prepared an estimate for the costs of responding to the Plaintiff's request.

3. The framework I used for making the estimates was developed by the IRS CFO to cost reimbursable products.

4. It is a regular part of my job responsibilities to make such estimates for various tasks that my component is asked to perform, generally in the context of costing proposed reimbursable projects.

5. The framework is routinely used by the IRS for estimating costs of staff and other resources used on projects for purposes of reimbursement.

6. I have supervisory responsibility for IT specialists in my branch, and am familiar with their abilities and typical knowledge base.

12025222.1

7. I spent 12 years regularly working with statisticians and economists in the Statistics of Income Division of RAS and am familiar with their abilities and typical knowledge base; I have also previously worked as an economist.

8. I am generally familiar with the structure of XML files as part of my duties overseeing the IT specialists who prepare XML data for internal IRS functions.

9. I am familiar with the contents of Form 990, as well as common variations in the practices of e-filers and the redaction requirements, as part of my duties overseeing the administration of the SOI Exempt Image Network (SEIN) system.

10. During the course of development of this estimate, I relied on the expertise of those who would be most intimately involved in this process should it occur.  I relied on the knowledge of the subject matter experts and IT specialists and their management to determine the steps that would need to be taken as well as their estimated duration.

11. In developing an estimate, I drew on my knowledge of the typical abilities of statisticians and economists within the Statistics of Income Division to conclude that they would have the necessary general skills and abilities to be able to learn how to edit an XML file, because they are generally proficient with computers as part of their job requirements.

12. As the subject matter experts of the Form 990 series for the Statistics of Income Division, I concluded that they would be familiar with the typical contents of a Form 990, its schedules, and its attachments, since they routinely work with

-2-

Forms 990's. This familiarity would extend to common deviations by some filers from the Form's instructions on what information to include (or omit) on different parts of the Form, its schedules, or attachments.

13. I also concluded that they would be more familiar with restrictions on disclosure of certain information that normally or occasionally appears on Forms 990 and their attachments, since they routinely prepare materials for disclosure to the public.

14. In contrast, the IT specialists, while already knowing how to edit an XML file, would not be familiar with the redaction requirements in place for Form 990 or the common practices of Form 990 filers.

15. I concluded that given the risk of releasing personally identifiable information, the statistician and economist would be better equipped to isolate and redact personally identifiable information from the XML data given their broad range of experience with the Form and attachments.

16. Additionally, it would be more cost effective to use a statistician and economist to perform the redactions rather than an IT specialist because it would take far less time to train the statistician and economist in the Statistics of Income Division on how to redact information from an XML file than it would to train a IT specialist familiar with editing XML files on all the large variety of circumstances in which information must be redacted from a Form 990. Knowing what to redact from a Form 990 requires an ability to account for a large number of situations where

-3-

redaction requires more than merely removing the portion tagged as being the official IRS Form 990 Schedule B on an electronically filed return.

17. Most of these permutations are described at length in I.R.M. 3.20.12 "Imaging and Perfecting Exempt Organization Returns for Public and Internal Viewing," previously filed in this proceeding as Exhibit 103.

18. While it would be relatively simple to remove the portion of XML that is tagged as the official IRS Form 990 Schedule B, other personally identifiable information may be present elsewhere on the return and would require redaction.

19. First, there are many elements included in an XML file that do not have a companion field on the official Form 990, and are automatically excluded by the rendering process that converts the XML file to an image file.

20. One of these elements is the portion of the electronic filing referred to as "general dependencies" which allows filers to include any information they wish, without any restriction on its transmittal to the IRS.

21. These fields may include filing information such as personal information on the filer, electronic filing PINs account logon information, and preparer information.

22. Consequently, the potential release of the raw XML files requires an extensive review of the XML file to ensure it does not contain information unsuitable for public disclosure which was not viewable on the rendered image and therefore could not be anticipated.

-4-

23. Secondly, the XML tags which delineate the official Form 990 Schedule B do not necessarily encompass all Schedule B information (i.e. contributor data) that the filer provided.

24. In my experience, filers have included some or all Schedule B information elsewhere on the Form 990, either by inserting this information into other pages of the Form 990 or other schedules, or including them as a separately-attached file that is transmitted together with the Form 990.

25. For example, filers have been known to prepare a list of contributors in a program such as Excel and attach it to the return rather than inputting this information in the official Schedule B field, or to list donors on portions of the return other than Schedule B.

26. In addition, filers sometimes include information not suitable for public release on various other portions of the form, its schedules, or attachments, which the protocols require be redacted.

27. Since only a portion of another schedule might need to be redacted, it would take more than simply deleting a field tag to make the redaction, as in the case of Schedule B, and increases the likelihood of error, thus requiring that once the redaction is done, the file be saved and checked to ensure it renders properly.

28. These items would not be clearly marked and would require the manual review of a subject matter expert to locate and remove them.

-5-

29. Furthermore, many of the redaction guidelines for forms or schedules which may be included with Form 990s require dependences (e.g. if checkbox 1 and checkbox 3 are selected, redact Form X. Otherwise do not redact Form X).

30. Some of these dependencies change from year to year as different versions of the Form 990 are published.

31. These variations are described in detail in the protocols for manual redaction.

32. Because of these nuances, I concluded that it would not be a simple or efficient task for the IT specialists in my branch to learn what must redacted from a Form 990, much less for them to apply this knowledge by writing and vetting a program that would perform the redactions automatically.

33. Therefore, I concluded that for nine Form 990 returns, it is more efficient and effective to have a statistician and economist complete the redactions manually.

34. In order to estimate how long it would take to perform the redactions, I relied on estimates by the staff members who would be making the redactions after explaining to each what the task would involve.

35. It is customary, when making estimates for smaller-scale projects under the CFO's guidelines, to obtain such estimates from the staff involved or other staff familiar with the skills required for the incumbent of the position involved.

36. My estimate of 4.5 hours for "manual redaction of XML" reflects the complexity associated with locating the various types of data that might be subject to redaction, including both entire fields, like Schedule B, that must be redacted and

discrete content subject to redaction contained in fields that may also include

releasable matter.  On average, this amounts to 30 minutes per return, although

the duration for each return will vary significantly with the length and number of

the schedules and attachments provided by the filer.

37. My estimate of 2.25 hours for "creation of redacted XML files" reflects the act of

saving changes made as well as an initial review completed by the junior subject

matter expert (SME) of their changes prior to submitting it to the senior SME for

their review.  On average, this amounts to approximately 15 minutes per return,

although, as with the redaction, this time will vary depending on the size of the

return.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

Executed this ___28___ day October, 2014.

_____
Lisa S. Rosenmerkel
Chief, Imaging & Technical Support Branch
Office of Research, Analysis & Statistics
Internal Revenue Service
Washington, D.C. 20002